**REPORTED**

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 2174

September Term, 2014

_____

IN RE: ADOPTION OF SCOTT W.V.



Meredith,
Kehoe,
Moylan, Charles E., Jr.
        (Retired, specially assigned),

JJ.


Opinion by Meredith, J.


Filed: October 29, 2015

Scott W.V., appellant, was adopted as an infant in 1958. His adoptive parents are now deceased. Appellant has long been interested in learning whatever information he can about his birth parents, and has been able to access redacted portions of his adoption case file. The process has stalled, however. This appeal addresses the denial of appellant's request to access any of the information about his birth father that was redacted from the original adoption case file. The Circuit Court for Montgomery County denied appellant's motion, and stated that "[t]here is no further information for the Court to release to the [appellant] as there is no non-identifying information to which the [appellant] is entitled pursuant to Family Law Article §§ 5-3A-40 and 41."[1]

---

[1] Maryland Code (1984, 2006 Repl. Vol.), Family Law Article ("FL"), § 5-3A-40 provides:

> (a)    (1)    (i)    **On request of an adoptee** or adoptive or former parents of an adoptee **and without a showing of need, a child placement agency shall provide information, other than identifying information, in its adoption record** on the adoptee.
>
>                 (ii)    If a child placement agency denies a request under this paragraph, then on petition of an adoptee or adoptive or former parent and without a showing of need, a court shall order access for the petitioner to inspect, in accordance with subsection (b) of this section, the agency's record on the adoptee.
>
>    (2)    **On petition of an adoptee** or an adoptive or former parent of an adoptee **and without a showing of need, a court shall order access for the petitioner to inspect,** in accordance with subsection (b) of this section, **the court's record on the adoptee**.
>
> (b)    **A court may not order opened for inspection** under this section any part of a record that contains **identifying information.**
>
>                                              (continued...)

Appellant contends on appeal that the circuit court's denial of his motion was both an error of law and an abuse of discretion because, he argues, the information he seeks — which was used by an intermediary and a professional investigator in a fruitless but "exhaustive" attempt to locate his birth father — is necessarily non-identifying information, and, under FL § 5-3A-40, he is entitled to all non-identifying information without a showing of need. No other party has filed a brief in this appeal.

## QUESTIONS PRESENTED

Appellant presents two questions for our review:

1. Whether the trial court's denial of appellant's unopposed motion requesting additional information about his birth father was erroneous as a matter of law because it incorrectly interpreted the category of "identifying information" defined at Annotated Code of Maryland, Family Law Article, § 5-3A-01(d) to include information that revealed neither his birth father's identity nor location?

2. Whether the trial court's denial of appellant's unopposed motion requesting additional information about his birth father was an abuse of discretion in failing to recognize that the special and compelling reasons presented by appellant's motion outweigh the interests of the birth parents and to issue written findings as to the interests sought to be protected by the order?

---

[1](...continued)
(Emphasis added.)

For purposes of FL § 5-3A-40, "identifying information" is defined as follows in FL § 5-3A-01(d): "'Identifying information' means information that reveals the identity or location of an individual."

2

For the reasons that follow, we will remand this case, without affirmance or reversal, to the Circuit Court for Montgomery County for further proceedings in accordance with this opinion.

**FACTS AND PROCEDURAL HISTORY**

Appellant was born at the Florence Crittenton Maternity Home in Washington, D.C., on May 1, 1958. His natural mother was an unmarried 33-year-old secretary who had concealed her pregnancy from her parents, quit her job with the federal government, and entered a maternity home sometime after Christmas in 1957. According to the 1958 Report of Adoption Investigation, appellant's mother was "anxious that no hint of the pregnancy become known to [her] parents, who are very substantial, conservative people, as she knew they would be very hurt." For the first thirteen days after appellant's birth, he was cared for in the maternity home by his birth mother. He was then placed in the care of an adoption agency on May 14, 1958. The agency's (heavily redacted) records indicate that appellant was placed with his adoptive family on June 11, 1958, and that his adoption was finalized on December 22, 1958.

The record of the circuit court proceedings in this case reveals that, in 2002, appellant contacted the Montgomery County Department of Health and Human Services "to learn about his adoption and birth history." Helen Clark, an adoption social worker with the Department, acted as an intermediary, and reviewed appellant's sealed adoption records. Ms.

3

Clark wrote appellant a letter on May 23, 2002, summarizing the non-identifying information she had learned about the circumstances of his birth and adoption. Ms. Clark's letter stated:

> Your birth mother was described as being healthy, exceptionally tall and slender. She was thirty-three years of age when she gave birth to you. At that time, she had no other children. She was one of two children, with a younger brother who was aware of her pregnancy. Your birth mother was very dependent upon her parents and she found it difficult to break away from home because she believed her mother would be depressed at the prospect of both of her children being away from her. They were unaware of her pregnancy.
>
> Your birth mother completed two years of college and worked as a secretary. The record indicated that your birth parents knew each other very briefly and that your birth father was your birth mother's first sexual experience. After your birth, your birth mother gave you personal care during the thirteen days you were together in a maternity home. She was pleased to know something of your adoptive parents and expressed satisfaction with the adoption plan. The record also indicated that whenever your birth mother returned to her family she wrote two or three letters and sent a card while on a trip. However, it is unclear from the record as to whom the letters and card were addressed or sent. The items were not in the record.
>
> **There is very little information in your record regarding your birth father. Nothing was known regarding his health. He was a college graduate and employed as an architectural engineer. His age was not provided.**
>
> At birth, you weighed six pounds, fourteen ounces and were nineteen inches long. You were born at 1:41 p.m. Forceps were used, causing a right occipital hematoma that completely disappeared within a few weeks. **No birth father is listed on your original birth certificate**. You were placed into foster care on May 14, 1958, and placed with your adopt[ive] family on June 11, 1958.
>
> I hope this information is helpful.

(Emphasis added.)

4

On July 20, 2009, appellant filed a Verified Motion to Unseal Adoption Records and Petition for Inspection of Non-Identifying Information and Appointment of an Intermediary, along with a request for hearing. Appellant represented that he was seeking "access to his adoption records to the greatest extent permitted by law" and "the opportunity to inspect his sealed adoption records *firsthand*, to the greatest extent possible in view of the confidentiality laws protecting the privacy wishes and identifying information of his birth mother." (Emphasis in original.) In the motion, appellant cited FL § 5-3A-40(a)(2) in support of his argument that, as an adoptee, he was entitled to the release of non-identifying information from his adoption case file without a showing of need. In addition, appellant asserted that he had a variety of "special and compelling reasons" that entitled him to access to "as much information as is possible under Md. R. 16-1009[.]"[2] Appellant pointed to the fact that his then-11-year-old son was of abnormally short stature, and family health information "would allow [appellant] and his wife to make an informed decision regarding treatment for their son's abnormal growth rate and consider the usefulness of endocrine treatment," which was of a time-sensitive nature. Appellant's motion was denied without a hearing, as was his motion for reconsideration.

---

[2]Maryland Rule 16-1009 enables a party to a case to petition to either have the case record sealed or otherwise limited, or "to permit inspection of a case record . . . that is not otherwise subject to inspection under the Rules in this Chapter or Title 20." The Rule provides, at (d)(4)(B), that a court, in deciding whether to permit inspection of an otherwise-sealed case record, must consider "whether a special and compelling reason exists to permit inspection."

Appellant appealed to this Court, but, before this Court could consider the merits of that appeal, the parties filed a consent motion to remand, which we granted via order of December 2, 2010.  *See Scott W. V.[] v. Montgomery County Department of Health and Human Services*, No. 0034, September Term, 2010, order entered December 2, 2010.  We ordered the Circuit Court for Montgomery County to enter orders

> directing the custodian of the appellant's adoption case record to permit the appellant to personally inspect and copy the index of the adoption case record, if there is an index that is kept apart from the docket itself, and provided that all identifying information is redacted from the index prior to inspection; and . . . [to] permit the appellant, pursuant to Md. Code Ann., Family Law § 5-3A-40(a)(2)(b), to personally inspect and copy the non-identifying information contained in the record, provided that all identifying information is redacted prior to inspection; and . . . [to] schedule a full adversary hearing on the appellant's motion under Md. R. 16-1009 concerning access to the parts of the case record not otherwise subject to inspection; and . . .[to] schedul[e] a hearing on appellant's request for the appointment of an intermediary to contact his birth father to obtain urgently needed medical information, pursuant to Family Law § 5-3A-41.

Upon remand, a guardian *ad litem* was appointed for the birth mother, and a confidential intermediary was appointed to attempt to contact appellant's birth mother.  In the order appointing the confidential intermediary, the court directed the intermediary to attempt to ask the birth mother certain questions embodied in a three-page attachment to the order.  On September 27, 2011, the intermediary was able to converse with appellant's birth mother via telephone.  According to the intermediary's confidential memorandum of that phone call, the birth mother was "cooperative," but also "very firm and adamant that she will not respond to the list of questions that was attached to the order."  The birth mother also told

6

the intermediary that she "did not recall the height of the birth father, and only knew his first name." It was the opinion of the intermediary that, based on the "very limited information from the birth mother, as well as information from the court's adoption record," the intermediary "did not, and does not currently, have sufficient information to identify, locate and contact the birth father, or determine if he is deceased."

On April 12, 2012, the court entered an order appointing a guardian *ad litem* for the birth father, specifying that "the overriding interest" of the guardian "shall be to protect [the birth father's] privacy rights[.]" The order gave the birth father's guardian *ad litem* access to appellant's unredacted adoption case file. It also recognized that the parties had recently discovered the name of the private adoption agency that handled (or was the successor to the entity that in 1958 had handled) appellant's adoption, and the order directed that agency, upon appellant's request, to redact its records pertaining to appellant's adoption and to provide the redacted records to the guardians *ad litem*. The order further directed the guardians *ad litem* to review the redacted records and notify the court whether they approved the release of the redacted records to appellant.

Pursuant to FL § 5-3A-41, the April 12, 2012, order also appointed an intermediary, Bethany Stahl, who was a licensed graduate social worker, "to perform a diligent search to identify, locate and try to contact the birth father to obtain urgently needed medical information . . . that would be likely to assist [appellant's] family in making an informed decision about treatment" of their son's growth issues. The intermediary was granted full

7

access to the unredacted adoption case record. The order provided that, "[a]t [appellant's] expense, and at the intermediary's discretion, the intermediary may engage a private investigator or other search and trace services to assist in locating the birth father using the identifying information contained in the court and agency records, taking care that no identifying information is released to the [appellant][.]"

The April 12 order also included the following provision which contemplated the release of additional information to appellant:

> [It is further ordered] that, **if the identity and location of the birth father is still unknown to the intermediary to the birth father after an exhaustive search** is made by her or at her direction, **the Court shall consider the release to [appellant] of additional information about the birth father from the Court's sealed adoption case record and the private adoption agency's record** (subject to the review and recommendations of the Guardian Ad Litem appointed to represent each birth parent) **on the basis that this information would be by definition non-identifying information to which [appellant] is entitled under law[.]**

(Emphasis added.)

As ordered, the court-appointed intermediary commenced a search for appellant's birth father, and enlisted the help of a private investigator. On October 10, 2013, the intermediary filed a summary of her investigation, along with a summary of the efforts made by the private investigator. In her summary, the intermediary mentioned having shared the original adoption record with the private investigator, "[a]lthough there was less information in the file than we believed there would be[.]" Despite the paucity of information, the intermediary and the investigator spent over a year attempting to identify appellant's birth

8

father, but, in the end, their efforts were unsuccessful.  The intermediary stated: "I have been unable to reach out to the birth father, because we were unable to identify him based on the little information we had been provided."  The intermediary's summary concluded:

> Mr. Pennacchia [the private investigator] also attempted to search for professional or educational societies that the alleged birth father could have belonged to, and also for women who may have been in the same maternity home as the birth mother, and thus may have known her.  After those attempts were inconclusive, **Mr. Pennacchia and I concluded that there is not enough information in the file we received from the original agency to identify the actual birth father.**  *The information about the birth father is sparse, and Mr. Pennacchia and I are doubtful as to the veracity of the little information that is provided.*  For instance, no one at the agency ever met the alleged birth father, so they relied solely on self-report from the birth mother for information about him. [ONE SENTENCE REDACTED] As a licensed social worker working in the field of adoption, my clinical judgment causes me to be skeptical of this scenario.  I have worked with a number of women who have given false information about birth fathers at the time of placement.  At times, they have done this to protect themselves or the birth fathers; and at other times because it is easier than telling a difficult truth.

(Emphasis added.)

The private investigator, Mr. Pennacchia, was able to use the bits and pieces of information in the original adoption record to locate and contact the birth mother's brother, but the trail to appellant's birth father went cold, and the mother's brother adamantly refused to provide any further information.  Mr. Pennacchia summarized:

> I read and re-read the information contained in the original documents from the Adoption Agency.  I found much of it to be imaginary, embellished, and unreliable. [ONE SENTENCE REDACTED] She knew that the man was Protestant, the University he graduated from, the city he worked in.  I tend to believe in what has not been written.  The Mexico trip with the girlfriend, most likely an alibi to protect someone else.  If the birth mother undertook the trip with a male colleague from her DC job, would this not throw us off track?

9

With this in mind, I pointed my attention to the birth mother's brother. According to the original reports, he was the person closest and most dedicated to her during the rough times. [TWO SENTENCES REDACTED] I wrote him a letter date[d] Aug. 30, 2012, via FedEx overnight (copy attached).

I waited approximately ten days, received no reply[.] I telephoned Mr. [REDACTED]. I mentioned the letter, he acknowledged receiving it. I was surprised and stunned by his hostility and anger. He requested that I never contact him again, that he thought this person (his nephew [*i.e.*, appellant]) was "barking up the wrong tree", that so much time had gone by, that we must leave he and his sister in peace and [he] terminated the contact. I concluded that the information we seek may remain with the mother and uncle.

After a hearing on January 13, 2014, the guardians *ad litem* reviewed the summary reports of the intermediary and the investigator referenced above, and agreed on redactions that needed to be made to those documents to remove identifying information. The circuit court reviewed the reports and made additional redactions. On January 28, 2014, the parties reconvened for a brief hearing, after which the redacted documents were released to appellant's counsel. The following colloquy, which is relevant to the issues presented in the instant appeal, occurred after the court ruled that appellant was entitled to the redacted reports of the intermediary and the investigator:

[BY THE COURT]: I'm not entirely sure that there is anything else for the Court to do from here, that is to say that perhaps the Court's role in this process is completed at this point.

[BY APPELLANT'S COUNSEL]: Your Honor? First of all, just to clarify, my assumption is that the intermediary was not able to identify, locate, and contact the birth father?

A [BY THE COURT]. That's correct.

Q [BY APPELLANT'S COUNSEL]. Okay.

A [BY THE COURT]. The letter will tell you that, but that is correct.

Q [BY APPELLANT'S COUNSEL]. Okay. And I'm pleasantly surprised to hear that the investigator made an effort to contact I guess the mother's brother, which I think we have some — that's not new to me that there was a brother out there. I don't know who he is, but I heard that at some point. So that's encouraging at least that he took certain steps.

A [BY THE COURT]. Right. And I mean, the documents will tell you that those efforts were complete, let's just say.

Q [BY APPELLANT'S COUNSEL]. When you say complete, have you determined —

A [BY THE COURT]. You'll be able to tell from the letter that the investigator reached the brother.

Q [BY APPELLANT'S COUNSEL]. Okay. Okay. And, **Your Honor, have you decided if you consider the search to have been exhaustive?**

A [BY THE COURT]. **Yes, I have. I do believe it is.** I believe that's what you'll also get from the letter that the investigator and the intermediary, each of their letters I guess is what I mean — will be, I think it's clear — that they both believe they've gone as far as one can expect to go under these circumstances. I mean, one of the things that's true here is that [appellant] is roughly my age. So these people are elderly. So other people who might be in the picture would also be elderly, well over 80 years old. And so they may not be alive is my point.

Q [BY APPELLANT'S COUNSEL]. I guess — we wanted to know if — it sounds like the answer is yes — but just to clarify here that the search was exhaustive, because all sorts of reasonable leads were followed, as opposed to if the search had been done differently or better or something like that — **you feel like an exhaustive search has been made?**

A [BY THE COURT]. **Yes, I do.**

Q [BY APPELLANT'S COUNSEL]. Okay.

11

A [BY THE COURT]. And largely for the reason I just articulated, that it's hard to follow this kind of a trail at this point, 50 years hence, with people who are — well, I don't think it's anything that's not in the letter — unwilling to cooperate further. So there's no way to get more information from them. And I, frankly, think that the kind of commitment that we make in these cases about anonymity in these kinds of adoptions has also to be balanced here. **And I don't think there's any way to go further**.

Q [BY APPELLANT'S COUNSEL]. Okay.

A [BY THE COURT]. Any way that would be in the — let's say would be compliant with what the statute says about where this trail has to end once we've done everything that we can. **And I believe everything that can be done has been done. [. . .]**

* * *

— **I will say I think the trail has been exhausted. And there's nothing that I can see the Court doing further here.** [. . .]

* * *

I'm trying to help you understand that, while I recognize that this result may be a disappointment in some ways, because the answer didn't get reached, *I see no other avenue to take and no other information in any part of the court file that would assist.*

(Emphasis added.)

Three months later, on April 29, 2014, appellant filed a Motion to Release Limited Additional Information, the denial of which led to this appeal. In that motion, appellant cited the provision of the April 12, 2012, order that referred to considering the release of additional information, and appellant argued that, because a diligent and exhaustive search for appellant's birth father undertaken by professionals using the unredacted adoption record proved fruitless, then, by definition, the information in the unredacted record about the birth

12

father was "non-identifying," and therefore, appellant was entitled to see it. In his motion, appellant specifically requested a "fresh review" of certain redactions which, he asserted, appear to pertain only to his birth father. These redactions related to the birth father's first name, the university he attended, the name of his employer, race or color, and any background history that might have been provided in the adoption agency's 1958 investigation leading up to appellant's adoption. The specific information that had been previously redacted and withheld from appellant, which he now asked the court to release pursuant to FL § 5-3A-40 as "non-identifying" in light of the fact that a professional investigator with access to that information was unable to identify the birth father, was as follows:

> Given the search history, revelation to the petitioner of the following few redactions pertaining only to his birth father should neither impinge on either of his birth parents' privacy interest nor lead to their identity or location:
>
> a. In the Court's own records:
>
> i. On page 7 of the Report of Adoption Investigation dated December 12, 1958, the entry concealed by the black marker redaction of the response to the prompt calling for the first name of "Child's father." A copy of the page is attached as Exhibit A.
>
> ii. On page 8 of the same Report of Adoption Investigation, which is a continuation of the section begun on the prior page titled "Circumstances in child's own family that have bearing on his being available for adoption," specifically in the third full paragraph on page 8, the redactions concealing what appears to petitioner's birth father's school and California employer. A copy of page 8 is attached as Exhibit B. In light of the previously

13

mentioned idea that there may be a correlation between petitioner's chosen profession and that of his birth father, any information about where his birth father was educated or worked might help to corroborate this interesting familial similarity.

b. In the agency records:

i. In the Report of Adoption Investigation dated August 1, 1958, on page 7, the black marker redactions covering the name, birthdate and birthplace section concerning "Child's Father", as well as the sections, going on to the following pages 8 and the very top blacked out line of page 9, titled "Circumstances in child's own family that have bearing on his being available for adoption" and "Physical history of child's own family." A copy of the pages are attached as Exhibit C. Petitioner is in no position to gauge whether there is any material in the original, unredacted version of those sections that might pertain to his birth father, but if there is, petitioner asks the Court here to consider this also as a request for the disclosure of such information to the extent it falls within the type of material requested by this motion.

ii. On the next page of the agency records, the Certification of Adoption for Maryland State Department of Health shows a blank entry for the prompt on the form calling for "Father's name" or "Race or color." It is unclear if this was redacted or by whom, but if it was, petitioner asks the Court to consider a request for a second review of that line as well. A copy is at Exhibit D.

iii. On page 4 of the report titled "Background history of baby" found about six pages from the back of the agency's records, the top of the page has a section about "Father." To the extent any of the information in that section was indeed redacted (since it is unclear to the undersigned) and may not be considered identifying information since it did not yield the birth father's identity, petitioner requests its disclosure. Exhibit E. To

14

be more specific, in view again of the possible correlation between the professions of the petitioner and his birth father, revelations from prompt numbers 13, and 14, in the "Father" section on Exhibit E would be particularly appreciated by the petitioner.

The motion asked that the court furnish the guardians *ad litem* with the full, unredacted records of appellant's adoption so that the guardians *ad litem* could review them, and "recommend to the Court whether the specific requests contained in [appellant's] motion should now be considered non-identifying information to which [appellant] is entitled (without a showing of need) in light of the fact that the Court concluded that the fruitless search was exhaustive[.]"[3] Appellant did not request a hearing, and the court did not conduct one. Nor does the docket reflect any judicial action on the file until the motion was denied.

On November 14, 2014, the court denied appellant's motion, and provided the following, single-sentence explanation: "There is no further information for the Court to release to [appellant] as there is no non-identifying information to which [appellant] is entitled pursuant to Family Law Article §§ 5-3A-40 and 41." This appeal followed.

## STANDARD OF REVIEW

Because this appeal involves the interpretation of a statute, our review is *de novo*. "A question of statutory interpretation is reviewed *de novo*." *Barnes v. Greater Baltimore Medical Center, Inc.*, 210 Md. App. 457, 471 (2013). "[W]here an order involves an

---

[3]Appellant also asked that if the Court's records were not the unredacted version, that the court order the adoption agency to provide the court with the full version of the record.

15

interpretation and application of Maryland constitutional, statutory or case law, our Court must determine whether the trial court's conclusions are 'legally correct'. . . ." *Schisler v. State*, 394 Md. 519, 535 (2006)*; Wash. Suburban Sanitary Comm'n v. Phillips*, 413 Md. 606, 618 (2010).

## DISCUSSION

## I

At one point in the past, adoption records were not sealed. "[A]doption only became part of American law in the late nineteenth and early twentieth centuries, and . . . adoption procedures initially established by state statutes provided neither for confidentiality with respect to the public nor for secrecy among the parties, but were subsequently amended to protect the parties from public scrutiny." Elizabeth J. Samuels, *The Idea of Adoption: An Inquiry into the History of Adult Adoptee Access to Birth Records*, 53 RUTGERS L. REV. 367, 368 (2001) (footnotes omitted). "In the mid-1920s, there were virtually no confidentiality or secrecy provisions in adoption law . . . . By the mid-1930s to the early 1940s, there were more state provisions for confidentiality with respect to the general public's access to court records, but still few provisions for secrecy among the participants." *Id*. at 374. However, "[w]ith respect to court records rather than birth records, contemporary evidence indicates that by the late 1940s and early 1950s a significant, if not a dramatic, shift had occurred: court records by that time were apparently closed in many states to all persons." *Id*. at 377.

16

By 1939, Maryland "had foreclosed adult adoptee access to original records." *Id*. at

377 n.57. As Professor Samuels noted in the referenced article:

> When one searches the historical record from the 1930s through the 1960s to understand how and why the adoption process became cloaked in secrecy — specifically why court records in most states came to be closed to all, and birth records in many states came to be closed even to adult adoptees — one finds through the 1950s a chorus of influential, authoritative voices supporting the complete closure of *court records* while recommending that *original birth records* remain available to adult adoptees. More generally, throughout the entire period, one finds that the reasons proffered for confidentiality and secrecy focus solely on protecting adoptees from embarrassing disclosure of the circumstances of their births and on protecting adoptive parents and their adoptive children from being interfered with or harassed by birth parents, as it was believed they might be if birth parents and adoptive parents who were unknown to one another were to learn one another's identity. Among the legal, social service, and other social science commentators, there appears to be no or virtually no discussion of a need to protect birth parents from adult adoptees seeking and acquiring information about their birth families.

*Id*. at 385 (emphasis in original).

The author of a 2005 note similarly surveyed the history of the closure of adoption

records and placed Maryland among the twenty states, plus the District of Columbia, which

"allow[ed] adoptees to gain access to their adoption records by court order only, subject to

a showing of good cause," citing the then-applicable FL § 5-329.[4] Caroline B. Fleming, Note,

*The Open-Records Debate: Balancing the Interests of Birth Parents and Adult Adoptees,* 11

WM. & MARY J. WOMEN & L. 461, 472 (2005) (footnotes omitted).

---

[4] Prior to the 1984 codification of the Family Law Article, the "special provisions governing access to sealed adoption records," which "were first enacted by ch. 387 of the Acts of 1982," were "codified at Art. 16, § 85 of the Code." *In re Adoption No. 147 in the Circuit Court for Montgomery County*, 314 Md. 719, 724 (1989).

The statute under which appellant sought relief in this case is FL § 5-3A-40, which was introduced during the 2005 legislative session as Senate Bill 710 ("SB 710"). SB 710 was entitled the "Permanency for Families and Children Act of 2005," and it effected a number of changes in various Maryland statutes. For instance, FL § 5-329 was repealed, and some of its provisions were transplanted elsewhere, including FL § 5-3A-40. The preamble to SB 710 provided, as relevant to FL § 5-3A-40, that it was meant to "delineat[e] procedures for private agency guardianship and adoption" and "restat[e] provisions relating to records[.]"

Despite the 2005 changes in the statutes, one aspect that remained constant was the prohibition against a court releasing information identifying an adoptee's birth parents. *Cf.* (former) FL § 5-329(b) ("The court may not order opened for inspection any part of a record that contains any information that reveals the location or identity of the individual's birth parents.") *with* (current) FL § 5-3A-40(b) ("A court may not order opened for inspection under this section any part of a record that contains identifying information.").

Appellant contends that the circuit court necessarily erred in denying his motion because the court misinterpreted the statutory definition of "identifying information." He argues that, if the court-appointed intermediary, and the professional investigator she hired, were unable to successfully use the information that has been redacted and withheld from appellant to identify or locate appellant's birth father, then, logic compels the conclusion that the redacted information appellant seeks — which did not "reveal[ ] the identity or location

18

of an individual" — is not "identifying information" within the purview of the statute, and should now be made available to him as contemplated by the circuit court's order of April 12, 2012.

Key principles governing statutory construction were summarized as follows by the Court of Appeals in *Lockshin v. Semsker*, 412 Md. 257, 274-77 (2010) (citations omitted):

> The cardinal rule of statutory interpretation is to ascertain and effectuate the real and actual intent of the Legislature. A court's primary goal in interpreting statutory language is to discern the legislative purpose, the ends to be accomplished, or the evils to be remedied by the statutory provision under scrutiny.
>
> To ascertain the intent of the General Assembly, we begin with the normal, plain meaning of the language of the statute. If the language of the statute is unambiguous and clearly consistent with the statute's apparent purpose, our inquiry as to legislative intent ends ordinarily and we apply the statute as written, without resort to other rules of construction. We neither add nor delete language so as to reflect an intent not evidenced in the plain and unambiguous language of the statute, and we do not construe a statute with "forced or subtle interpretations" that limit or extend its application.
>
> We, however, do not read statutory language in a vacuum, nor do we confine strictly our interpretation of a statute's plain language to the isolated section alone. Rather, the plain language must be viewed within the context of the statutory scheme to which it belongs, considering the purpose, aim, or policy of the Legislature in enacting the statute. We presume that the Legislature intends its enactments to operate together as a consistent and harmonious body of law, and, thus, we seek to reconcile and harmonize the parts of a statute, to the extent possible consistent with the statute's object and scope.
>
> Where the words of a statute are ambiguous and subject to more than one reasonable interpretation, or where the words are clear and unambiguous when viewed in isolation, but become ambiguous when read as part of a larger statutory scheme, a court must resolve the ambiguity by searching for legislative intent in other indicia, including the history of the legislation or

other relevant sources intrinsic and extrinsic to the legislative process. In resolving ambiguities, a court considers the structure of the statute, how it relates to other laws, its general purpose, and the relative rationality and legal effect of various competing constructions.

In every case, the statute must be given a reasonable interpretation, not one that is absurd, illogical, or incompatible with common sense.

Here, appellant contends that the statutory phrase "identifying information" should be interpreted to mean *information that directly identifies* the birth parent rather than *information that may lead to the discovery of the identity* of the birth parent. Appellant emphasizes that the General Assembly defined "identifying information" to mean "information that reveals the identity or location of an individual." In appellant's view, the legislature's use of the word "reveals" rather than "leads to," or even "could reveal," is significant.

But we are not persuaded that the phrase should be interpreted as narrowly as appellant urges. The General Assembly did not say "directly reveals" or "immediately reveals" or "independently reveals." And we are not persuaded that it was the intent of the legislature to restrict the definition of identifying information in that manner. It seems to us that there could be many items of information that do not, when considered in isolation, reveal the identity of an individual, but could nevertheless provide key identifying information to a party seeking to identify a parent. We are not persuaded that the General Assembly intended that every bit of information must be released unless the identity of the person is immediately apparent from that particular item of information.

20

We have considered whether we might find guidance from the statute's enumeration of the policies and purposes supporting the enactment of Family Law Title 5, Subtitle 3A. When the General Assembly passed Subtitle 3A to Title 5 of the Family Law Article, it explained, at § 5-3A-03, its "purpose, aim, or policy in enacting" this particular statute as follows:

> (a)    The General Assembly finds that the policies and procedures of this subtitle are desirable and socially necessary.
>
> (b)    The purposes of this subtitle are to:
>
>> (1)    timely provide permanent and safe homes for children consistent with their best interests;
>>
>> (2)    protect children from unnecessary separation from their parents;
>>
>> (3)    ensure adoption only by individuals fit for the responsibility;
>>
>> (4)    protect parents from making hurried or ill-considered agreements to terminate parental rights;
>>
>> (5)    protect prospective adoptive parents by providing them information about prospective adoptees and their backgrounds; and
>>
>> (6)    protect adoptive parents from a future disturbance of their relationship with adoptees by former parents.

Although this statement of policy and purpose makes no mention of protecting the identities of birth parents, it provides little guidance about protecting the identity of any

21

person. And the statutory definition of protected "identifying information" is applicable to any "individual" in this subtitle, not just birth parents.

We note that the General Assembly has adopted a broad definition of the term "identifying information" in connection with the statutory crime of identity fraud. Maryland Code (2002, 2012 Repl. Vol., 2014 Supp. ), Criminal Law Article, § 8-301(a)(6) provides the following definition:

> (6)　　(i) "Personal identifying information" includes a name, address, telephone number, driver's license number, Social Security number, place of employment, employee identification number, health insurance identification number, medical identification number, mother's maiden name, bank or other financial institution account number, date of birth, personal identification number, unique biometric data, including fingerprint, voice print, retina or iris image or other unique physical representation, digital signature, credit card number, or other payment device number.
>
> (ii) "Personal identifying information" may be derived from any element in subparagraph (i) of this paragraph, alone or in conjunction with any other information to identify a specific natural or fictitious individual.

Although this statutory definition was adopted specifically to address identity fraud, it illustrates that information that does not independently reveal a person's identity can nevertheless be considered personal identifying information.

Consequently, we conclude that a broader definition of the identifying information protected from disclosure under FL § 5-3A-01(d) is more likely the legislative intent, and that "reveals" should be construed to mean "could reasonably lead to the discovery of" the identity of the protected individual.

Assuming that to be the proper definition of identifying information, we are nevertheless unable to effectively review whether the circuit court applied that definition when it considered appellant's motion. The court provided no explanation of why the court concluded that any of the specific bits of redacted information requested by appellant were deemed to be "identifying information" even though the aggregate of such redacted information did not enable the investigator and intermediary to identify the birth father. The court's denial noted simply that "[t]here is no further information for the Court to release to [appellant] as there is no non-identifying information to which [appellant] is entitled pursuant to Family Law Article §§ 5-3A-40 and 41." Appellant's motion had requested "a fresh review" of specific redactions in the records, which were redactions appellant believed "pertained only to his birth father." The circuit court's blanket denial gives us no clue whether appellant's belief was right or wrong, and even if he was right, why the court deemed each redaction to be information "that reveals the identity or location of an individual."

Appellant asked only for the information that had been redacted from the record as it pertained to his birth father. It may well be that there is no such information. It may be that the redacted information is somehow identifying information relative to someone else. But we cannot determine, on the basis of this record, whether and to what extent the trial court conducted an item by item analysis of the request.

In *Sumpter v. Sumpter*, 427 Md. 668 (2012), a mother contended that she was prejudiced at her custody trial in the Circuit Court for Baltimore City because that court apparently had an unwritten policy or rule sharply restricting access to reports prepared by the court's custody-evaluation unit. According to the mother, only counsel for the parties — not the parties themselves — were permitted to view a copy of such a report at the Family Division Clerk's Office, during business hours only. Counsel could not copy the report, and could only make notes of the report's contents. Counsel could not copy verbatim passages. Apparently, unrepresented parties were allowed to view only the portions of the report that pertained to themselves, not the opposing party. The Court of Appeals expressed reservations about the propriety of this unwritten policy, but concluded ultimately that a remand, without affirmance or reversal, was necessary because "[e]ffective review of the Circuit Court policy or rule is not possible given the paucity of the present record." *Id*. at 683. In its remand decision, the Court of Appeals specifically made reference to Maryland Rule 16-1009:

> When sealing or limiting access to a case record, a trial judge must make findings about the interest sought to be protected from inspection, supported by specific findings. Md. Rule 16–1009 (d)(2); see also *Balt. Sun Co. v. Colbert*, 323 Md. 290, 305, 593 A.2d 224, 231 (1991) (citing *In re Knight Publ'g Co.*, 743 F.2d 231, 235 (4th Cir.1984) ("A court ruling on a motion to seal judicial records should articulate the interest sought to be protected by the seal, supported by specific findings.")). When determining whether to preclude or limit inspection of a case record, as was the case here, the trial judge must consider "whether a special and compelling reason exists" to justify restricted access. Md. Rule 16–1009(d)(4)(A). The trial court's final order that precludes or limits inspection of a case record "shall be as narrow as practicable in scope and duration to effectuate the interest sought to be protected by the order." Md.

24

Rule 16–1009(d)(3); see also *Colbert*, 323 Md. at 306, 593 A.2d at 231. Moreover, the trial court must state why alternatives to sealing or limiting access to the case record were rejected. *Balt. Sun v. Thanos*, 92 Md. App. 227, 246, 607 A.2d 565, 574 (1992) (discussing requirements for sealing a pre-sentencing report in a first-degree murder case).

The limited record before us does not illuminate sufficiently the full contours of the Circuit Court policy or rule, its origin, the balancing of the interests sought to be protected by it against competing interests, whether less restrictive alternatives were considered and why they were rejected, and any special or compelling reasons to prohibit the parties' attorneys from receiving a copy of the custody investigation report. Effective review of the Circuit Court policy or rule is not possible given the paucity of the present record. *Thanso*, 92 Md. App. at 246, 607 A.2d at 574. Therefore, remand to the Circuit Court for supplementation of the record is appropriate. *Colbert*, 323 Md. at 307, 593 A.2d at 232; *Thanos*, 92 Md. App. at 246, 607 A.2d at 574.

*Id*. at 682-83 (footnotes omitted.)

As in *Sumpter*, here, the limited record before us does not reveal enough about the circuit court's analysis of the requested information for us to determine whether the court's ruling was sound. Accordingly, we remand this case pursuant to Maryland Rule 8-604(d), without affirmance or reversal, for the circuit court to make findings comparable to those required in *Sumpter*. The court should specifically address each of the redactions that appellant identified, and either make the redacted information available or explain why the redacted information constitutes identifying information which must be withheld.

**II**

In his second contention on appeal, appellant asserts that the court abused its discretion, and violated Rule 16-1009, when it failed to issue written findings explaining its denial of his motion. We note that appellant made no mention of Rule 16-1009 in the

25

motion which is the subject of this appeal, and he raised no argument in the circuit court regarding the application of Rule 16-1009 to the motion that is the subject of this appeal. Consequently, this issue is not preserved for appellate review.

**JUDGMENT NEITHER AFFIRMED NOR REVERSED; CASE REMANDED TO THE CIRCUIT COURT FOR MONTGOMERY COUNTY FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. THE COURT SHOULD SPECIFICALLY ADDRESS EACH OF THE REDACTIONS THAT APPELLANT IDENTIFIED, AND EITHER MAKE THE REDACTED INFORMATION AVAILABLE OR EXPLAIN WHY THE REDACTED INFORMATION CONSTITUTES IDENTIFYING INFORMATION WHICH MUST BE WITHHELD. COSTS TO BE PAID BY APPELLANT.**