148 N.J. Super. 302 (1977)
372 A.2d 646
JOYCE ARLENE MILLS, NOW KNOWN AS JOYCE ARLENE LOVALLO, PLAINTIFF,
v.
ATLANTIC CITY DEPARTMENT OF VITAL STATISTICS; NEW JERSEY STATE REGISTRAR, DEFENDANT, AND CHRISTINA MARIE BLATTLER, NOW KNOWN AS CHRISTINA MARIE HADLEY, PLAINTIFF,
v.
ATLANTIC CITY DEPARTMENT OF VITAL STATISTICS; CHARLES A. KARKUT, NEW JERSEY STATE REGISTRAR, DEFENDANT, AND LAURIE ANN CORSON, PLAINTIFF,
v.
CHARLES A. KARKUT, NEW JERSEY STATE REGISTRAR; AUDUBON DEPARTMENT OF VITAL STATISTICS, DEFENDANT, AND ALICE MARIE COFFEY, NOW KNOWN AS ALICE MARIE LAUFHUTTE, PLAINTIFF,
v.
CAMDEN DEPARTMENT OF VITAL STATISTICS, CHARLES A. KARKUT, NEW JERSEY STATE REGISTRAR, DEFENDANT.
Superior Court of New Jersey, Chancery Division.
Decided February 4, 1977.
*306 Mr. Donald Shapiro for plaintiffs (Messrs. Milstead, Ridgway & Shapiro, attorneys).
Mr. William F. Hyland, Attorney General of New Jersey, attorney for defendants (Ms. Charlotte Kitler, Deputy Attorney General, of counsel and on the brief).
GRUCCIO, J.S.C.
Plaintiffs challenge the constitutionality of N.J.S.A. 26:8-40.1 which requires the state registrar to place under seal the original birth certificate of any child who is adopted, thereby placing a shield of secrecy over the identity of the child's natural parents. Additionally, plaintiffs challenge N.J.S.A. 9:3-31 which provides that the seal of secrecy may be broken only upon the order of a court for good cause shown. Plaintiffs are all adult adoptees who seek access to their adoption records. They contend that the statutes abridge their right to privacy and to receive important information. Further, it is their position that the statutes deny equal protection of the law, contrary to the mandate of the Fourteenth Amendment.
In order to properly consider this matter it is necessary to look carefully at the adoption procedure and the parties involved. Adoption was unknown at common law. 26 Rutgers L. Rev. 693 (1973), note 8 at 695. Adoption and its legal consequences "are of statutory origin, to serve a socio-familial policy of prime import." In re Holibaugh, 18 N.J. 229, 233 (1955). In recognition of the fact that children are at times born whose natural parents cannot, or for reasons *307 of their own, do not wish to care for them, the State in its role as parens patriae has by legislative action created the adoption process to provide these children with a stable home environment in which to grow. Under the statutory scheme of N.J.S.A. 9:3-17 et seq. the legal relationship between the natural parents and the child is terminated and the adoptive parents legally become the child's only parents. The termination of legal relationship between natural parent and child includes, under N.J.S.A. 26:8-40.1 the issuance of a new birth certificate containing the names of the adoptive parents. The original birth record is placed under seal in accordance with that statute.
The purpose of the Adoption Act, N.J.S.A. 9:3-17 et seq., is to promote policies and procedures socially necessary and desirable for the protection not only of the child placed for adoption but also for the natural and adopting parents. In re P., 114 N.J. Super. 584, 591 (App. Div. 1971). The purpose of the confidentiality surrounding the birth records arises out of the circumstances that lead to the legal proceedings. The natural parents, having determined that it is in their own and the child's best interests, have placed the child up for adoption. For example, this decision may be precipitated by an illegitmate birth status of the child and the inability of the unwed mother or father to care properly for the child. The assurance of secrecy regarding the identity of the natural parents enables them to place the child for adoption with a reputable agency, with the knowledge that their actions and motivations will not become public knowledge. Assured of this privacy by the State, the natural parents are free to move on and attempt to rebuild their lives after what must be a traumatic and emotionally tormenting episode in their lives.
The adopting parents also have an interest in having the birth records placed under seal. They have taken into their home a child whom they will regard as their own and whom they will love and raise as an integral part of their family unit. It is important to these adopting parents that they *308 may raise this child without fear of interference from the natural parents and without fear that the birth status of an illegitimate child will be revealed or used as a means of harming the child or themselves. The State has an active interest in protecting and nurturing the growing family relationship it has statutorily created.
The child, who is the third and ultimately most important party to the adoption, has no voice in the proceedings. He or she is not represented as an individual by legal counsel. The child's only protection at the proceedings is the thoroughness of the report of the Division of Youth and Family Services and the perceptiveness of the presiding judge. The State has an obligation to protect the interests of this voiceless party. In re P., supra; In re B., 63 N.J. Super. 98 (App. Div. 1960). Sealing the birth records serves the interests of the child. It protects the child from any possible stigma of illegitimacy which, though fading, may still exist, and insures that the relationship with his or her new parents can develop into a loving and cohesive family unit uninvaded by a natural parent who later wishes to intrude into the relationship. The statute requiring that the records be sealed clearly serves the interests of all three parties in the adoptive triangle: adoptive parents, natural parents and the child.
Plaintiffs here are no longer children but adults who have grown in their adoptive parents' homes and are already psychologically the children of those parents.[1] The family relationship *309 which the State has created and protected has grown to maturity. Plaintiffs allege that as adults the information regarding their natural parents is part of their identity as human beings. They contend that the State, by refusing automatic access to birth records that nonadopted persons have, is abridging a constitutionally protected right to privacy and to receive important information.
The United States Supreme Court has recognized that a constitutional right to privacy exists. In Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1687, 14 L.Ed.2d 510 (1965), the court determined that a constitutionally protected zone of privacy is created in the penumbra emanating from the fundamental guarantees of the First, Fourth, Fifth and Ninth Amendments. This guarantee of personal privacy is made applicable to the individual states by the Fourteenth Amendment. Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); Meerwarth v. Meerwarth, 128 N.J. Super. 285 (Ch. Div. 1974). In Roe v. Wade, the Supreme Court declared that only those personal rights that can be deemed "fundamental" or "implicit in the concept of ordered liberty" are included in the guarantee of personal privacy. 410 U.S. at 152, 93 S.Ct. at 726.
The Supreme Court in San Antonio School District v. Rodriguez, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973), declared that the key to determining whether an interest is "fundamental" is not to be found in comparisons of relative societal significance but rather whether the right asserted is explicitly or implicitly guaranteed by the Constitution. 411 U.S. at 33, 93 S.Ct. 1278. In Rodriguez, the court held that education, perhaps the most important function of state and local government,[2] is not a fundamental *310 personal right protected under the Federal Constitution. The cases which establish the right to privacy in marriage and procreation[3] deal with the most intimate areas of marital and personal privacy. Even in these areas the right to privacy is not absolute. In Doe v. Commonwealth's Atty., 425 U.S. 985, 96 S.Ct. 2192, 48 L.Ed.2d 810 (1976), the court in a memorandum decision affirmed the decision of a Virginia District Court[4] that the right of privacy does not protect private homosexual behavior from punishment under a state sodomy law. It is the opinion of this court that while information regarding the heritage, background and physical and psychological heredity of any person is essential to that person's identity and self image, nevertheless it is not so intimately personal as to fall within the zones of privacy implicitly protected in the penumbra of the Bill of Rights.[5]
Even when constitutionally protected, the right to privacy is not absolute. Its parameters are continually being defined. Meerwarth v. Meerwarth, supra. In Roe v. Wade, supra, the Supreme Court reiterated that the right to privacy may be regulated by the state if such regulation is justified by compelling state interest. In State v. Saunders, 130 N.J. Super. 234 (Law Div. 1974), the court upheld a statute which made fornication unlawful. The court cited Justice Goldberg's concurring opinion in Griswold v. Connecticut, supra, that a state may significantly encroach on a person's liberty upon showing a subordinating state interest which is compelling *311 or that the enacted law is necessary to the accomplishment of a permissible state policy. In Saunders the statute was upheld on the basis of a compelling state interest in preventing the birth of illegitimate children and controlling the spread of venereal disease.
When, as here, no fundamental interest is involved, the statute challenged will be upheld if it is reasonable, not arbitrary, and bears a rational relationship to a permissible state objective. Belle Terre v. Boraas, 416 U.S. 1, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974). Constitutional and other personal rights may be limited for the protection of other individuals or the public, and where the absolute exercise of the right harms these other elements it may be restricted. State v. Hopson, 109 N.J. Super. 382 (Law Div. 1970), Duratron Corp. v. Republic Stuyvesant Corp., 95 N.J. Super. 527 (App. Div. 1967), certif. den., 50 N.J. 404 (1967). Certain intrustions on the privacy of the individual may be justified in the public interest. Hamilton v. N.J. Real Estate Comm'n, 117 N.J. Super. 345 (App. Div. 1971).
In the present case the right to privacy asserted by plaintiffs is in direct conflict with the right to privacy of another party, the natural parent. As has been noted previously, the natural parent surrenders a child for adoption with not merely an expectation of confidentiality but with actual statutory assurance that his or her identity as the child's parent will be shielded from public disclosure. In reliance on these assurances the natural parent of an adult adoptee has now established new life relationships and perhaps a new family unit. It is highly likely that he or she has chosen not to reveal to his or her spouse, children or other relations, friends or associates the facts of an emotionally upsetting and potentially socially unacceptable occurrence 18 or more years ago. This natural parent has a right to privacy, a right to be let alone, that is not only expressly assured by the provisions of N.J.S.A. 26:8-40.1 and N.J.S.A. 9:3-31 but has also been recognized as a vital interest by the United States Supreme Court. Stanley v. Georgia, 394 U.S. 557, 89 *312 S.Ct. 1243, 22 L.Ed.2d 542 (1969). In Stanley the court cited with approval Justice Brandeis' dissent in Olmstead v. U.S., 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944 (1928), in which he stated that the makers of the Constitution, to secure conditions favorable to the pursuit of happiness, conferred upon Americans "the right to be let alone  the most comprehensive of rights and the right most valued by civilized men." 277 U.S. at 478, 48 S.Ct. at 572. Freedom from governmental intrusion is shielded in the Bill of Rights. The protection of a person's general right to privacy  his right to be let alone by other people  is, like the protection of his property and of his very life, left largely to the law of the individual states. Katz v. U.S., 389 U.S. 347 at 350-351, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). The New Jersey statutes which seal adoption records protect the right to privacy of the adopting parents and that of natural parents from unwarranted intrusion. The Legislature recognized that this right to privacy also cannot be made absolute, that parties such as the adult adoptees here may have a countervailing interest which may warrant disclosure in spite of assurances of secrecy. For this reason the Legislature provided in N.J.S.A. 9:3-31 that upon good cause shown a court may order that the records be revealed to the party making proper application. This statutory provision vests in the court the power to weigh and balance the competing privacy rights and make a determination based on the facts and circumstances of each individual case.
Plaintiffs contend that the statutes abridge their right to receive important information, relying on Stanley v. Georgia, supra, and other landmarks cases which hold the right to receive information is protected by the First Amendment. Red Lion Broadcasting Co. v. F.C.C., 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969); Lamont v. Postmaster General, 381 U.S. 301, 85 S.Ct. 1493, 14 L.Ed.2d 398 (1965); Martin v. Struthers, 319 U.S. 141, 63 S.Ct. 862, 87 L.Ed. 1313 (1943). This court agrees that plaintiffs have a right to receive important information. Certainly the *313 information sought here is vitally important to these parties. Nevertheless, I reiterate that no constitutional or personal right is unconditional and absolute to the exclusion of the rights of all other individuals.
The statute herein does not totally deny plaintiffs' access to the information they seek. It only requires that they as members of a class in which there is an overwhelming state interest must demonstrate good cause in order to protect the countervailing privacy rights of the natural parents. Such a limitation based upon a valid state policy of protecting the rights of others is not an unconstitutional exercise of state power. Stanley v. Georgia, supra; Hamilton v. N.J. Real Estate Comm'n, 117 N.J. Super. 345 (App. Div. 1971); State v. Kabayama, 98 N.J. Super. 85 (App. Div. 1967), aff'd, 52 N.J. 507 (1968).
Cases involving the Freedom of Information Act, 5 U.S.C.A. § 552 (1966), have recognized that the right to receive important information, even when codified as an express Congressional policy, is not an absolute right but must be tempered in its exercise by the need to safeguard the legitimate claim of privacy of persons who would be affected by disclosure. Hence in Rose v. Dep't. of Air Force, 495 F.2d 261 (2 Cir.1974), aff'd 425 U.S. 352, 96 S.Ct. 1592, 48 L.Ed.2d 11 (1976), the court required in camera screening of case summaries of honor and ethics hearings at the Air Force Academy prior to their disclosure under the Freedom of Information Act. In Wine Hobby U.S.A., Inc. v. U.S. Int. Rev. Ser., 502 F.2d 133 (3. Cir.1974), the court refused to compel the Government to disclose the names of persons registered to produce wine so that plaintiff could send unsolicited catalogues. The court found that such a disclosure would involve an unwarranted invasion of privacy.
In Gotkin v. Miller, 379 F. Supp. 859 (E.D.N.Y. 1974), aff'd, 514 F.2d 125 (2 Cir.1975), plaintiff sought access to her own medical records at hospitals where she had been a voluntary mental patient. The court denied access to the records, finding the confidentiality to be a valid hospital *314 policy. The court noted in dictum that the records may contain references to and statements by other mental patients, as well as references to other individuals who are entitled to some degree of confidentiality.
I find that plaintiffs' rights to privacy and to receive important information are not unconstitutionally abridged by N.J.S.A. 26:8-40.1 and 9:3-31 read in pari materia, but rather are permissibly limited in accordance with a valid state interest to balance conflicting rights of privacy and to protect the integrity of the adoption process which is likely to suffer if the assurances of secrecy are not present.
Plaintiffs next contend that the statutes deny adoptees as a class the equal protection of the laws guaranteed by the Fourteenth Amendment. They said that it is an unconstitutional discrimination to require adoptees to obtain a court order to gain access to their birth records when nonadopted persons, both adult and child, may obtain a copy of their birth certificate as a matter of course upon the payment of a minimal registrar's fee.
Constitutional principles of equal protection do not require that all persons be treated identically. State v. Krol, 68 N.J. 236 (1975). In Torres v. Wagner, 121 N.J. Super. 457 (App. Div. 1972), the court noted that
The Legislature had wide discretion in the creation and recognition of classes for difference treatment... If there is a reasonable basis for the recognition of separate classes and the disparate treatment of the classes has a rational relationship to the object sought to be achieved by the Legislature, the equal protection clause is not violated. [at 459]
When, however, a classification is invidious or penalizes a fundamental right, then it is "suspect" and the State must show a compelling governmental interest to sustain the validity of the classification. State in Interest of K.V.N., 116 N.J. Super. 580 (App. Div. 1971), aff'd, 60 N.J. 517 (1972).
I have found that no fundamental right has been abridged by the statutes challenged here. Plaintiffs argue that the *315 statutory classification which requires adoptees to secure a court order to obtain birth records is suspect. They rely on Supreme Court decisions which have examined classifications based on race, national origin, sex and illegitimacy. See, e.g., Loving v. Virginia, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967); Graham v. Richardson, 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971); Frontiero v. Richardson, 411 U.S. 677, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973); Jimenez v. Weinberger, 417 U.S. 628, 94 S.Ct. 2496, 41 L.Ed.2d 363 (1974). The definition of a suspect class is unfortunately not a clear one. The Supreme Court has not enunciated definitive guidelines or criteria for determining whether a statutory classification is suspect. In Frontiero v. Richardson, supra, Justice Brennan, speaking for a plurality of the court regarding sex as a suspect class, suggested that suspect classes are those that suffer from "an immutable characteristic determined solely by the accident of birth" and have had a history of the relegation of the class to an inferior status. 411 U.S. at 685-687, 93 S.Ct. at 1770. Only race and alienage have been definitely recognized as suspect classifications. Brown v. Bd. of Ed., 347 U.S. 483, 493, 74 S.Ct. 686, 98 L.Ed. 873 (1954); Loving v. Virginia, supra; Graham v. Richardson, supra; Sugarman v. Dougall, 413 U.S. 634, 93 S.Ct. 2842, 37 L.Ed. 2d 853 (1973). In Frontiero Justice Powell wrote a concurring opinion in which Chief Justice Berger and Justice Blackmun joined. The Justices felt that sex should not be added to the "narrowly limited group of classifications which are inherently suspect." 411 U.S. at 692, 93 S.Ct. at 1773.
It is clear in my mind that the status of adoptee does not satisfy the criteria of suspect classification. An adoptee does not derive that status from an accident of birth but as the result of a legal proceeding which has as the very essence of its purpose the protection of that adoptee's best interest. Rather than vilify or relegate the adoptee to an inferior status, the adoption process of which the challenged statutes are an integral part often improves the situation of the child, *316 insuring a home, family unit and loving care which might otherwise not be guaranteed.
The State has more than a rational basis, it has a compelling interest in regulating the access sought here. An adoptive child, like the child of a divorce, is not a "normal" child. His or her life has been affected by the intervention of a court proceeding. The State has become involved in the creation of the child's home life. The Legislature has determined that the best interests of all the parties to the adoption including those of the child, are served by a statutory shield of confidentiality. When the child grows to maturity, the State continues its interest in the integrity of the adoption process and in the privacy rights of all the parties expressly protected by N.J.S.A. 26:8-40.1 and N.J.S.A. 9:3-31. In furtherance of that interest the State has provided that the courts shall perform the socially and legally vital role of balancing the rights and needs of the adoptee with those of the natural parent. The interest of the State in this later situation is just as significant and reasonable as its interest in protecting the privacy of the adopting and natural parents during the child's minority. Therefore, I find that N.J.S.A. 26:8-40.1 and N.J.S.A. 9:3-31 abridge no fundamental right protected by the Constitution, nor do they create a suspect classification, but rather protect a rational state interest by placing reasonable limitations upon the adoptee's access to their birth records.
Since the State has chosen to make this court the arbitrator of the rights and interests of the parties, adoptees, natural parents and adoptive parents, it is necessary that preliminary guidelines of procedure be established to efficiently handle the ever increasing number of requests from adoptees for information regarding their natural parents.[6] It is fully within the powers of a court of equity to do this. In In re *317 Quinlan, 137 N.J. Super. 227 (Ch. Div. 1975), mod., 70 N.J. 10 (1976), the court discussed the authority of a Chancery court to act under the doctrine of parens patriae.
It has been stated that the power of equity is `the power possessed by judges  and even the duty resting upon them  to decide every case according to the high standard of morality and abstract right; that is the power and duty of a judge to do justice ...' 1 Pomeroy, Jurisprudence, § 44 at 57 (1941). It involves the obedience to dictates of morality and conscience. Id., § 45 at 59. It may not disregard statutory law and it looks to the intent rather than the form. 137 N.J. Super. [at 255; emphasis supplied]
In accordance with these principles I determine the following procedural criteria to be a solution which protects the rights of all parties, effectuates the intent of the Legislature and lessens the legal and financial burden which stands between an adoptee and his or her birth records where good cause exists.
First, in requests for disclosure of birth records when the adoptee has not yet reached the age of majority, the procedure shall remain as it is now. The party seeking access shall have to sustain the burden of showing good cause why the seal upon the records should be broken. That burden of proof should be a heavy one. A need to have access to family medical histories or information regarding the child's heredity may constitute good cause where the evidence presented in court shows a valid, justifiable need to obtain the information requested. In such circumstances, after weighing the effect the revelation will have upon all parties and the best interests of the minor child, the court shall determine whether the evidence presented creates sufficient showing of good cause to override the statutory guarantee of confidentiality.
When the child has attained maturity, he or she may have a desire to search for and find his or her natural parents. The need to search is now becoming more publicized and researched than ever before. With this publicity more and more adoptees daily are beginning to realize that their desire *318 to meet their natural parents is not unusual nor does it have any reflection on their relationship with their adoptive parents whom they may love dearly.
In the case of adult adoptees who request access to their own birth records, the burden of proof should shift to the State to demonstrate that good cause is not present. In certain situations the request of the adult adoptee for information should be granted as a matter of course. Where the natural parent has placed on file a consent to identification with the agency who placed the child, access by the adult adoptee should be automatically allowed.[7] It would in fact alleviate the procedure considerably if the registrar's office maintained in Trenton a central list of consenting natural parents in adoptions granted within this state. In such situations the adoptee's request to the registrar could be accomplished by consent order. Requests for medical, hereditary or ethnic background information should be granted, absent some showing of compelling reasons not to reveal the information.
There remains the question of adoptees who make the request based on a psychological need to know. The evidence before me is strong and the question of the need to know as good cause is so vital to the court's decision that I shall discuss the testimony and other evidence on this aspect at length. An adoptee who is moved to a court proceeding such as the one here is impelled by a need to know which is far deeper than "mere curiosity." The testimony before me is convincing that the need has its origins in the psychological makeup of the adoptee's identity, self-image and perceptions of reality. One adult adoptee who searched and found her natural mother testified that in addition to the desire to be able to relate hereditary and ethnic *319 background information to her children, she was driven to search by a deep-seated feeling of unreality  that her origin was not from a human being but an adoption agency. Other adoptees testifying described similar feelings of not belonging anywhere or to anyone. From the testimony it appears that these feelings may manifest themselves in physical symptoms such as nervousness or insomnia, or in a psychological inability of the adoptees to devote themselves fully and wholeheartedly to their efforts. There was a general feeling among the adoptees that the search is one for mental contentment.
The testimony of Dr. Zellig Bach, a psychologist and Ph.D. in family relationship, bears out the personal observations of the searching adoptees. He stated that the need to search, far from being curiosity, arises from a deficiency in their sense of self. To explain this handicap Dr. Bach described the psychological maturing process. He stated that in childhood the parents are mythologized by the child and seen as the smartest, best looking most wonderful people in the world. In order to grow up and develop his or own identity, the child must de-mythologize the parents and see them in a realistic perspective as fallible human beings. In doing so the mature person is able to develop his own identity and has a proper perspective on reality. In the case of an adopted child the natural parents are unseen and unreal to the adoptee. He or she is not able to de-mythologize them and a continuing sense of unreality pervades the self-image. This description of the psychological handicap which drives adoptees to search is borne out in the testimony of the adoptees before me. I am convinced that this compelling psychological need may constitute the good cause required by N.J.S.A. 9:3-31.
The court, in determining whether the records should be revealed must weigh the adoptees' needs against the natural parents' rights. Neither party has an absolute right. Additionally, once the information has been released, the adoptees' actions in attempting to contact the natural *320 parent will be difficult to oversee. The testimony of Florence Fisher, an adult adoptee who contacted her natural parents, demonstrates that unlimited access to the information may result in unwarranted intrusions. All the other adoptees who testified represented to me that if they were rejected by the natural parent they would attempt once or twice more to have a meaningful encounter. After that they would abandon their efforts since the need to know has been satisfied. There is no guarantee that the interference of the adoptee will indeed cease. Ms. Fisher testified that her natural mother, who had not told her husband or children of Ms. Fisher's existence, did not wish her family to learn of Ms. Fisher's reappearance into her life. Nevertheless, after waiting a period of 4 1/2 years for her mother to "do the honorable thing" and inform the family, Ms. Fisher decided that she had an absolute right to approach her half brother and reveal her identity to him. She did in fact do so. Although her encounter had a positive result, such an action in direct disregard of the wishes of the natural parent is an invasion of that parent's privacy. The results will not necessarily be as fortunate as Ms. Fisher's were. The testimony of Dr. Watson E. Neiman, a Deputy Commissioner of Health, described an incident in which an adoptee appeared unexpectedly at the home of her natural mother. The woman had not told her husband that she had given birth to an illegitimate child before their marriage. The woman's marriage was disrupted and to this date there has been no reconciliation.
The possibility of such disruption and intrusion into the lives of persons who will not be before the court to oppose the adoptees' applications makes it important that each request be referred to an intermediary agency for investigation, report and recommendation to the court. Requests by adult adoptees that come before this court will be assigned to the agency that made the adoptive placement. If the agency no longer exists or the adoption was the result of private placement, *321 an agency will be selected by the court. The agency handling the inquiry will be acting as an arm of the court and will have full freedom in its response to the request, including use of the official court record. Where a natural parent has consented, court approval of disclosure should be automatic. The agency may approach the natural parent to solicit consent to the release of the identifying data and obtain court approval to attempt to broker a contact. The agency should not broker a contact between the adoptee and the natural parent if it judges that harm to either will result. Nevertheless, the agency should work to meet the explicit request of the adoptee if feasible. At no time in its investigation shall the agency reveal the nature of its inquiry to anyone other than the natural parent. If the agency or the biological parent refuses to consent to the divulgence of identifying data, the adoptee shall have the right to appeal to this court. On the basis of the adoptee's reasons and a report from the investigating agency, the court shall then make a decision. Additionally, where the agency's investigation fails to locate the natural parents the adoptee may appeal to the court for the information necessary to carry on the search.
This solution to the complex problem of competing rights provides ample protection to the rights of all, ample service to minimize the worst risks, and ample satisfaction of all inquiries. The reunions which plaintiffs here are seeking are powerful human events, potentially explosive and damaging. While many reunions may be joyful, the investigating agency will provide standby help offered by someone familiar with the situation for those encounters which are negative. The State, which originally created the adoptive triangle, shall provide the adoptee professional help in the search for self which has arisen from that adoptive status. This is the very essence of the State's interest in the adoptive process  to help the adoptee grow to be a full and healthy member of society.
*322 Accordingly, plaintiffs' requests for information are hereby referred to the adoption agencies which made the original placement. If necessary an agency to make the investigation will be selected by this court. It is so ordered.
NOTES
[1] See Goldstein, Freud and Solnit, Beyond the Best Interests of the Child (1973). This work develops the concept of the "psychological parent" as the adult whose daily interaction with the child provides for his or her basic and essential need for an unbroken, affectionate, stimulating and close relationship with an adult. The book has been cited with approval by a Maryland Court of Special Appeals, Ross v. Hoffman, 33 Md. App. 333, decided Oct. 10, 1976, and a Pennsylvania Court of Common Pleas, In re John F., decided Dec. 21, 1976. 3 Fam. L. Rptr. 1039.

See also Note, "Alternatives to `Parental Right' in Child Custody Disputes Involving Third Parties." 73 Yale L.J. 152 (1963), cited with approval in In re P., 114 N.J. Super. 584 (App. Div. 1971).
[2] Brown v. Bd. of Education, 357 U.S. 483, 493, 74 S.Ct. 686, 98 L.Ed. 873 (1954). In Rodriguez the court explicitly restated Brown's recognition of the importance of education both to the individual and society. Nevertheless the court emphasized "the importance of a service performed by the State does not determine whether it must be regarded as fundamental."
[3] Skinner v. Oklahoma, 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942); Griswold v. Connecticut, supra; Eisenstadt v. Baird, 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972); Roe v. Wade, supra.
[4] 403 F. Supp. 1199 (E.D. Va. 1975).
[5] For evidence and research data on the psychological needs of adoptees who search for their natural parents, see W. Reynolds, Eisnitz, Chiappise and Walsh, "Personality Factors Differentiating Searching and NonSearching Adoptees," a paper presented to the American Psychological Ass'n., Sept. 1976. See also Sorosky, Baran and Panner "The Reunion of Adoptees and Birth Relatives," 3 J. of Youth and Adolescence 195 (1974).
[6] The deputy attorney general, during oral argument, specifically indicated that the state was interested in obtaining judicial guidelines and requested that I establish some.
[7] It has come to my attention that some agencies now inform the natural parents at the time of the adoption that their identity will be revealed to the adult adoptee upon request. Such situations shall be treated as a consent by the natural parent.