# IN THE SUPREME COURT OF IOWA

No. 15–1198

Filed March 11, 2016

Amended May 27, 2016

**IN THE INTEREST OF R.D.**

**R.D.,**

Appellant.

Appeal from the Iowa District Court for Linn County, Russell G. Keast, District Associate Judge.

Adopted person appeals juvenile court order denying application to unseal adoption records to identify her biological parents. **AFFIRMED.**

Peter J. Gardner of Meardon, Sueppel & Downer, P.L.C., Iowa City, for appellant.

**WATERMAN, Justice.**

Fifty years ago, a married couple gave up their newborn daughter for adoption. The adoption records were sealed. Today, we must decide whether the juvenile court correctly construed and applied Iowa Code section 600.16A(2)(*d*) (2015) when it denied the adoptee's application to unseal those records to identify her biological parents.

A loving adoptive family raised the adoptee, but she struggles with depression, anxiety, and alcohol abuse. She presented evidence that her ignorance of her biological family's history is a root cause of her mental health problems and that learning the identities of her biological parents would assist her treatment. The juvenile court found she met her evidentiary burden to establish that opening the adoption records is necessary to save her life or prevent irreparable physical or mental harm to her. The district court examined the adoption records in camera, found no relevant medical information other than her biological parents' identities, and ruled the statute precluded release of their names. The biological parents have filed no affidavit or consent to disclosure of their identities. The adoptee appealed, and we retained her appeal. For the reasons explained below, we determine this adoptee failed to meet her burden to overcome the statutory protection for the confidentiality of the identity of biological parents.

## I. Background Facts and Proceedings.

R.D., now age fifty-one, was born in Iowa in 1965. R.D.'s biological parents consented to her adoption and waived notice of any further proceedings. R.D. was adopted a few days later, and the adoption records were sealed pursuant to Iowa Code section 600.9 (1962), which stated, "The complete record in adoption proceedings, after filing with the clerk of the court, shall be sealed by said clerk, and the record shall not

thereafter be opened except on order of the court." The adoption statute in 1965 contained no provision allowing biological parents to file an affidavit consenting or objecting to disclosure of their identities. The biological parents have not been contacted in the pending proceeding, nor have they filed any consent form or affidavit regarding their position on disclosure.

R.D.'s adoptive family was loving and supportive. When R.D. turned six, her adoptive parents told her she was adopted. As she grew up, R.D. felt the "loss of [her] biological family" and "the loss of [her] own parents not having given birth to [her.]" Most importantly, she "felt like somebody gave [her] up" because they did not love her. She became obsessed with being the "best of everything" to avoid being abandoned again. R.D. achieved academic success, earning advanced degrees and induction into Phi Beta Kappa. Today she is on the faculty teaching at a prestigious university in another state and has been married to a supportive husband for several decades.

R.D.'s "lack of knowledge about her origins increasingly caused anxiety and depression." R.D. began self-medicating with alcohol in her thirties. In 2007, R.D. voluntarily checked herself into the Hazelden Rehabilitation Center in Center City, Minnesota. During a four-week inpatient program, she was introduced to a twelve-step program. She successfully completed her course of treatment. When she returned to her home, she became an active member in Alcoholics Anonymous with a sponsor.

In 2008, R.D. relapsed for the first time. She continued to work on her sobriety through Alcoholics Anonymous and with therapists, but she was unable to maintain prolonged sobriety. Each relapse involved drinking more and taking longer to regain sobriety. She missed

meetings, important social events, and professional deadlines during her relapses.

In May 2013, R.D. began seeing G.P. Zurenda Jr., a psychiatric social worker, to address her alcohol abuse. Zurenda diagnosed R.D. with alcohol dependence, anxiety disorder, and depression. Zurenda administered the Michigan Alcohol Screening Test to R.D., and her score indicated alcohol dependence. She scheduled regular appointments with Zurenda. R.D. occasionally canceled her appointments because she had been drinking. R.D. felt she had a "hole in [her] soul."

In June 2014, R.D. began seeing Dr. Anthony J. Pane Jr., a psychologist specializing in anxiety, depression, relationship problems, and substance abuse. R.D. sought out Dr. Pane because almost half of his practice was devoted to adoptees. Dr. Pane conducted a clinical interview and diagnosed R.D. with depression and alcohol dependence. Dr. Pane viewed R.D.'s adoption as the issue underlying her substance abuse and depression. Dr. Pane suggested she should try to identify her parents.

On August 1, R.D. wrote a letter to the Linn County District Court to ask for her adoption records to be unsealed. She wrote that she was seeking the records "due to significant medical issues, the short- and long-term management of which could be altered by a knowledge of [her] family medical history." On August 15, the district court denied R.D.'s request. The district court indicated that it had reviewed the file and found that there was no medical and developmental history or family medical history in the adoption record. The district court concluded that R.D.'s request was insufficient to warrant releasing the identities of R.D.'s biological parents.

On March 16, 2015, she wrote another letter to the Linn County District Court asking the court to open her adoption records. She indicated that her physicians and other health care providers recommended that she learn the identities of her birth parents "due to critical medical issues related to [her] short- and long-term health." She attached letters from her primary care physician, Dr. Orli Etingin, as well as from Zurenda, and Dr. Pane.

Dr. Etingin's letter stated that R.D. "has suffered from depression and alcohol dependence in the past." R.D.'s episodes of severe anxiety affected her work, family, and personal relationships. Dr. Etingin stated that R.D.'s "lack of information about her biologic family has impaired [her caregivers'] ability to care for her, and her ability to recover." R.D.'s risk for diabetes, heart disease, and stroke were all increased because of her stress. Dr. Etingin wrote she believed "it is medically essential that [R.D.] be given access to family history information."

Zurenda wrote that R.D. had made progress since he began working with her in 2013. He noted that she was currently abstinent and active in Alcoholics Anonymous. Zurenda stated that his "experience and extensive research shows that correctly identifying the etiology of one's alcoholism is very important in improving the odds of a person[']s continuing recovery from the disease." He said that knowing the root of R.D.'s alcoholism was essential because she had cooccurring disorders—depression and anxiety. Zurenda concluded that discovery of R.D.'s family history was essential to treat her alcoholism.

Dr. Pane's letter reported that R.D. was "highly gifted [and] highly successful . . . with a very supportive husband and adoptive family." However, he said he believed the "root of her mental health challenges" was her lack of knowledge about her biological parents. He "believe[d]

that knowledge of her history will be the breakthrough essential for her mental health." Dr. Pane's letter also stated that he was confident that R.D. would handle learning her parents' identities in a "reasoned, sensitive and responsible manner."

In addition to those three letters, R.D. submitted deposition testimony of Dr. Pane and Zurenda regarding her need to know her parents' identities.[1] Dr. Pane opined that R.D. was unable to compartmentalize her feelings of loss from her adoption. He believed R.D. would resume drinking if the court refused to release the identities of R.D.'s biological parents. Dr. Pane described her adoption, drinking, and depression as links in an interconnected chain and asserted that R.D. would need to know the identity of her parents to maintain her sobriety and avoid a deep depression.

Zurenda described R.D. as a "closet drinker" because she would drink in secret instead of attending to her professional obligations. R.D.'s drinking binges had worsened after her inpatient treatment in 2007, but R.D. had been abstinent in recent months. Zurenda opined that if R.D. was unable to maintain sobriety, she would need a liver transplant. He also reported that R.D. described her adoptive parents positively. Zurenda explained that he was unable to complete a biopsychosocial assessment for R.D. without the identity of R.D.'s biological parents. He testified that R.D.'s diagnosis might change based on her extended family's history. Zurenda said he was worried that if R.D. did not learn the identity of her parents, she would continue to relapse. Zurenda noted her need to know her biological parents' identities was based on more than just curiosity:

---

[1]Both worked outside Iowa and were unable to testify in person at the hearing.

> I think that she's developing the awareness that she does have—her alcohol abuse dependence is a true medical problem that she's not being able to deal with on her own. Quite honestly, I think if she had her preferences, she wouldn't even really be looking at the issue. It's something that has to be addressed.

Throughout his deposition, he emphasized that R.D. had a strong desire to quit drinking. In sum, Zurenda said:

> Addiction is a complicated calculus, and because I am very confident of my sense of her true desire to refrain from drinking, it is my informed belief that she continues to relapse and has over the past eight years—eight plus years that she's doing that to a large degree because she's having a difficult time finding a sense of self.
>
> This is a very high-functioning, very intelligent, very well-educated, very competent and self-possessed woman on most levels, but she keeps bumping into this psychological/emotional problem that keeps bringing her back to needing to drink, and when she falls off, she falls off terribly; and I really am concerned that if this question of where I came from—where she came from is not resolved that we're going to end up having this conversation sometime down the road when we're having to try and get these files opened because she's going to need a match to get a liver transplant.

On May 4, R.D. presented the depositions, letters, and her own testimony to the juvenile court. She relied on Iowa Code section 600.16A(2)(*d*) (2015), which allows access to adoption records "if opening is shown to be necessary to save the life of or prevent irreparable physical or mental harm to an adopted person or the person's offspring." She attributed her alcohol abuse to her sense of loss from being adopted. She admitted to being a closet drinker and explained that her alcohol dependence gave her "a lot of shame and guilt." She testified that each time she relapses she gets closer and closer to a life-threatening situation. She asserted that her physical and mental health was at stake. She testified that she had not discussed with her professionals what she would do if she learned her biological parents' identities, but

she asserted she "would probably spend a long time trying to figure out the best strategy . . . and again the most caring and compassionate one considering that they, again . . . probably experienced their own loss as well." The court asked if R.D.'s intent in opening the adoption records was to obtain "not specific information about the biological parents but the actual identities of the biological parents themselves and that that information is intended for treatment purposes to be directly provided to [R.D.] to help her address her issues." Her attorney replied that was correct.

On May 28, the court denied R.D.'s petition. The court emphasized that confidentiality is paramount in our adoption statutes. The court found that R.D. had "met her evidentiary burden, by showing upon competent medical evidence that opening the adoption records is necessary to save the life of or prevent irreparable physical or mental harm to the adopted person." Nevertheless, the court denied her petition because her sole purpose in her petition was to learn the identity of her biological parents. The court noted the absence of any other relevant medical information in the sealed adoption records. The court concluded:

> While the Court does not deny the existence of the Applicant's need to know, it is unable to conclude that by overtly revealing the identities of the biological parents directly to the Applicant or to medical providers whose sole intent is to forward that information to [R.D.], that the Court would be acting in accordance with the clear dictates of the statute or the intent of the legislature.

We retained R.D.'s appeal.

**II. Standard of Review.**

We review rulings on questions of statutory interpretation for correction of errors at law. *In re Adoption of S.J.D.*, 641 N.W.2d 794, 797

(Iowa 2002). We review de novo the factual issues in adoption-related equitable proceedings. *Id.* "We give weight to the juvenile court's factual findings, especially as to the credibility of witnesses, but we are not bound by them." *In re H.S.*, 805 N.W.2d 737, 745 (Iowa 2011).

### III. **Analysis**.

We must decide whether the juvenile court correctly denied R.D.'s application to open the records of her adoption to identify her biological parents. The privacy of adoption records implicates not only the rights of the adoptee, but also the rights of the adoptive parents, biological parents, other family members, and the state's interest in encouraging adoptions. *See In re Adoption of S.J.D.*, 641 N.W.2d at 800 ("[S]ection 600.16A is the legislature's attempt to balance those interests. The balance has been struck heavily in favor of keeping adoption records sealed."). R.D.'s biological parents terminated their parental rights in 1965 and have not been given notice of this proceeding. Unlike other states, Iowa's adoption statute lacks a specific provision for appointment of a guardian ad litem to represent the biological parents on requests for their identities.[2] Rather, under the existing Iowa adoption statute,

---

[2]New York's adoption law requires the appointment of a guardian ad litem to represent the interest of the biological parents before adoption records may be unsealed. *See, e.g.*, N.Y. Dom. Rel. Law § 114(4) (McKinney, Westlaw current through L. 2016, ch. 1) (requiring a court hearing a petition to open adoption records to appoint guardian ad litem to obtain medical information); *In re Anonymous*, 390 N.Y.S.2d 779, 782 (Sur. Ct. 1976) (appointing a guardian ad litem to locate the natural parents, inform them of their rights, and represent and protect their interests under the authority of a combination of general guardian ad litem statutes); *see also Mills v. Atl. City Dep't of Vital Statistics*, 372 A.2d 646, 654–56 (N.J. Super. Ct. Ch. Div. 1977) (exercising equitable power to require adoption agencies to determine whether the natural parents object to the release of information and shifting the burden of proof to the state to demonstrate that good cause is not present when the adoptee seeking the information is an adult). *But see In re Dixon*, 334 N.W.2d 373, 373 (Mich. 1983) (employing a presumption that the natural parents would oppose disclosure and appointing guardian ad litem for the purpose of contesting the issue of good cause).

biological parents may file consents[3] or affidavits[4] stating their position as to disclosure of their identities. Those provisions did not exist in 1965

---

[3]Iowa Code section 600.16A(3) allows biological parents and adult adoptees to file a written consent to revelation of his or her identity, as follows:

> 3. *a.* In addition to other procedures by which adoption records may be opened under this section, if both of the following conditions are met, the department, the clerk of court, or the agency which made the placement shall open the adoption record for inspection and shall reveal the identity of the biological parents to the adult adopted child or the identity of the adult adopted child to the biological parents:

> (1) A biological parent has placed in the adoption record written consent to revelation of the biological parents' identity to the adopted child at an age specified by the biological parent, upon request of the adopted child.

> (2) An adult adopted child has placed in the adoption record written consent to revelation of the identity of the adult adopted child to a biological parent.

> *b.* A person who has placed in the adoption record written consent pursuant to paragraph "*a*", subparagraph (1) or (2) may withdraw the consent at any time by placing a written withdrawal of consent statement in the adoption record.

> *c.* Notwithstanding the provisions of this subsection, if the adult adopted person has a sibling who is a minor and who has also been adopted by the same parents, the department, the clerk of court, or the agency which made the placement may deny the request of either the adult adopted person or the biological parent to open the adoption records and to reveal the identities of the parties pending determination by the juvenile court or court that there is good cause to open the records pursuant to subsection 2.

This provision was originally enacted in 1992. *See* 1992 Iowa Acts ch. 1196, § 4 (codified at Iowa Code § 600.16A(3) (1993)).

[4]Iowa Code section 600.16A(2)(*b*) allows biological parents to file affidavits, as follows:

> *b.* The juvenile court or court, for good cause, shall order the opening of the permanent adoption record of the juvenile court or court for the adopted person who is an adult and reveal the names of either or both of the biological parents following consideration . . . of the following:

> (1) A biological parent may file an affidavit requesting the juvenile court or court reveal or not reveal the parent's identity. The juvenile court or court shall consider any such affidavit in determining whether there is good cause to order opening of the records.

This provision was originally enacted in 1976. *See* 1976 Iowa Acts ch. 1229, § 25 (codified at Iowa Code § 600.16(2) (1977)).

when R.D. was adopted, and we have no such filing from her biological parents.

Our analysis begins with the text of the statute. *In re A.M.,* 856 N.W.2d 365, 371 (Iowa 2014) ("Our starting point is the statutory text."). Iowa Code chapter 600 governs adoptions. The legislature provided a guide to construction in section 600.1:

> This chapter shall be construed liberally. The best interest of the person to be adopted shall be the paramount consideration in interpreting this chapter. However, the interests of the adopting parents shall be given due consideration in this interpretation.

Iowa Code § 600.1 (footnote omitted). Section 600.16A addresses the confidentiality of adoption records. *Id.* § 600.16A. Section 600.16A(1) provides that adoption records "shall be sealed by the clerk." *Id.* § 600.16A(1). The next three subsections set forth the grounds for unsealing adoption records. R.D. relies on section 600.16A(2)(*d*), which provides:

> 2. All papers and records pertaining to . . . an adoption shall not be open to inspection and the identity of the biological parents of an adopted person shall not be revealed except under any of the following circumstances:
>
> . . . .
>
> *d.* The juvenile court or court may, upon competent medical evidence, open termination or adoption records if opening is shown to be necessary to save the life of or prevent irreparable physical or mental harm to an adopted person or the person's offspring. The juvenile court or court shall make every reasonable effort to prevent the identity of the biological parents from becoming revealed under this paragraph to the adopted person. The juvenile court or court may, however, permit revelation of the identity of the biological parents to medical personnel attending the adopted person or the person's offspring. These medical personnel shall make every reasonable effort to prevent the identity of the biological parents from becoming revealed to the adopted person.

*Id.* § 600.16A(2)(*d*). We have addressed section 600.16A in only one decision, *In re Adoption of S.J.D.*, 641 N.W.2d at 798–802 (denying adoptee's motion to unseal his adoption records). In that case, the adoptee presented no medical evidence and relied on a different section— 600.16A(2)(*b*). *Id.* at 796. By contrast, R.D. presented medical testimony that the juvenile court found met her evidentiary burden under section 600.16A(2)(*d*) to show revealing the identities of her biological parents is necessary to save her life or spare her irreparable physical or mental harm. The juvenile court nevertheless concluded the medical showing alone was insufficient to surmount the court's obligation to "make every reasonable effort to prevent the identity of the biological parents from being revealed to the adopted person." We agree.

The juvenile court reviewed the adoption records in camera, as have we. The records are devoid of medical information. We must decide whether the medical showing of the predicted therapeutic benefit to R.D. of learning the identity of her biological parents outweighs the statutory command to protect the identity of the biological parents. Significantly, the first sentence of section 600.16A(2)(*d*) uses the permissive term "may," unlike the next sentence, which uses the mandatory term "shall." *Compare* Iowa Code § 600.16A(2)(*d*) ("The juvenile court or court *may* . . . open . . . adoption records." (Emphasis added.)), *with id.* ("The juvenile court or court *shall* make every reasonable effort to prevent the identity of the biological parents from becoming revealed under this paragraph to the adopted person." (Emphasis added.)); *see also id.* § 4.1(30)(*c*) ("The word '*may*' confers a power."); *id.* § 4.1(30)(*a*) ("The word '*shall*' imposes a duty.").

Thus, the medical showing R.D. made gets her to first base, not across home plate. We are presented with a mixed question of fact and

law as to whether R.D. is entitled to disclosure of her birth parents' identities. We must decide this case mindful of the competing policies, which we review in depth below. We conclude on this record that the balance the legislature struck in favor of confidentiality mandates denial of R.D.'s application.

**A. The Evolution of the Confidentiality of Adoption Records.** "Because English common law did not recognize the practice of adoption, adoption in this country is purely statutory." *In re Adoption of S.J.D.,* 641 N.W.2d at 799. Adoption records were public in most states until the middle of the twentieth century:

> At one point in the past, adoption records were not sealed. "[A]doption only became part of American law in the late nineteenth and early twentieth centuries, and . . . adoption procedures initially established by state statutes provided neither for confidentiality with respect to the public nor for secrecy among the parties, but were subsequently amended to protect the parties from public scrutiny." "In the mid-1920s, there were virtually no confidentiality or secrecy provisions in adoption law. . . . By the mid-1930s to the early 1940s, there were more state provisions for confidentiality with respect to the general public's access to court records, but still few provisions for secrecy among the participants." However, "[w]ith respect to court records rather than birth records, contemporary evidence indicates that by the late 1940s and early 1950s a significant, if not a dramatic, shift had occurred: court records by that time were apparently closed in many states to all persons."

*In re Adoption of Scott W.V.,* 124 A.3d 1181, 1190–91 (Md. Ct. Spec. App. 2015) (quoting Elizabeth J. Samuels, *The Idea of Adoption: An Inquiry Into the History of Adult Adoptee Access to Birth Records,* 53 Rutgers L. Rev. 367, 368, 374, 377 (2001) [hereinafter Samuels] (footnotes omitted)).

The evolving confidentiality of Iowa's adoption records has reflected the national trend. Iowa adoption records were originally filed with real estate deeds and, like real estate deeds, were open to the public. *See* Iowa Code Revision of 1860 § 2602 (1860) ("[Adoption records] shall be

recorded in the county where the person adopting resides in the office, and with the record of deeds of real estate; and shall be indexed with the name of the parent by adoption as grantor, and the child as grantee in its original name if stated in the instrument.") (repealed 1927).  Iowa closed its adoption records in 1941.  1941 Iowa Acts ch. 294, § 1 (codified at Iowa Code § 600.9 (1946)).  The statute provided, "The complete record in adoption proceedings, after filing with the clerk of the court, shall be sealed by said clerk, and the record shall not thereafter be opened except on order of the court."  Iowa Code § 600.9 (1946) (current version at Iowa Code § 600.16A(1) (2015)).

In 1976, a decade after R.D.'s adoption, the Iowa legislature amended the adoption statute to provide conditions for unsealing records.  *See* 1976 Iowa Acts ch. 1229, § 25 (codified at Iowa Code § 600.16(2)–(3) (1977)).  Among other reasons, the statute, as amended, allowed the court to open records when "necessary to save the life of or prevent irreparable physical harm to" the adoptee.  Iowa Code § 600.16(3) (1977) (current version at Iowa Code § 600.16A(2)(*d*) (2015)).  The statute was reorganized in 1993 and permitted courts to also open records to prevent irreparable mental harm.[5]  1992 Iowa Acts ch. 1196, § 4 (codified at Iowa Code § 600.16A(2)(*d*) (1993)).  Although this statute has been amended several times since 1993, there have been no substantive changes regarding an adoptee's grounds to open his or her adoption records.  *See generally* Iowa Code § 600.16A (2015).

---

[5]The 1993 amendment also created a consent registry, which allowed natural parents to put a written consent to reveal the parent's identity on request of the child, and allowed an adult child to place a written consent to reveal the child's identity to the natural parent upon request.  *See* 1992 Iowa Acts ch. 1196, § 4 (codified at Iowa Code § 600.16A(3) (1993)).

**B. The Importance of Confidentiality of Adoption Records**.

"Confidentiality has been and continues to be the touchstone for these adoption statutes." *In re Adoption of S.J.D.*, 641 N.W.2d at 799; *see also In re Philip S.*, 881 A.2d 931, 933 (R.I. 2005) ("[T]he confidentiality of the adoption process is deemed to be of an extraordinarily high value."). Today, "most states still maintain sealed records for all or most adoptees." Ann M. Haralambie, *Use of Social Media in Post-Adoption Search and Reunion*, 41 Cap. U.L. Rev. 177, 177–78 (2013) (noting courts rarely exercise their authority to unseal records for good cause, and appellate courts rarely overturn denials of access, "often citing the privacy rights of the birth parents and even the adoptive parents"). The confidentiality of adoption records protects different interests:

> [C]onfidentiality serves several purposes. It shields the adopted child from possibly disturbing facts surrounding his or her birth and parentage, it permits the adoptive parents to develop a close relationship with the child free from interference or distraction, and it provides the natural parents with an anonymity that they may consider vital. The State's interest in fostering an orderly and supervised system of adoptions is closely tied to these interests of the parties involved.

*In re Adoption of S.J.D.*, 641 N.W.2d at 799 (quoting *Linda F.M. v. Dep't of Health*, 418 N.E.2d 1302, 1303 (N.Y. 1981) (citation omitted)).

Sealing adoption records helps promote the formation of the adoptive family. Adoptive parents have a strong interest in maintaining closed adoption records so "they may raise [the] child without fear of interference from the natural parents and without fear that the birth status of the illegitimate child will be revealed or used as a means of harming the child or themselves." *In re Adoption of Baby S.*, 705 A.2d 822, 824 (N.J. Super. Ct. Ch. Div. 1997) (quoting *Mills v. Atl. City Dep't of*

*Vital Statistics*, 372 A.2d 646, 649 (N.J. Super. Ct. Ch. Div. 1977)). Confidentiality also

> protects the child from any possible stigma of illegitimacy, which, though fading, may still exist, and insures that the relationship with his or her new parents can develop into a loving and cohesive family unit uninvaded by a natural parent who later wishes to intrude into the relationship.

*Id.* (quoting *Mills*, 372 A.2d at 649). Indeed, R.D. enjoyed a strong familial bond with her adoptive parents. R.D. is age fifty-one and testified her adoptive parents support her quest to identify her biological parents. However, section 600.16A applies to myriad relationships among adoptees of all ages, biological and adoptive parents, siblings, and extended families. Moreover, R.D.'s biological parents have not consented to revelation of their identities.

> The assurance of secrecy regarding the identity of the natural parents enables them to place the child for adoption with a reputable agency, with the knowledge that their actions and motivations will not become public knowledge. Assured of this privacy by the State, the natural parents are free to move on and attempt to rebuild their lives after what must be a traumatic and emotionally tormenting episode in their lives.

*Id.* (quoting *Mills*, 372 A.2d at 649). R.D.'s biological parents presumably believed their identities would remain confidential when they placed her for adoption. *See* Iowa Code § 600.9 (1962) ("The complete record in adoption proceedings . . . shall be sealed by said clerk, and the record shall not thereafter be opened except on order of the court."). While some biological parents who gave up children for adoption may welcome contact from them, others may desire continued anonymity. An adoptee's contact with a birth parent can disrupt her family and community life. *See In re Creed*, 337 N.W.2d 41, 42 (Mich. Ct. App. 1983) (per curiam) (stating petitioner, who had been raped and gave

resulting baby up for adoption, alleged severe emotional distress when her biological son confronted her twenty-one years later).

Birth mothers filed constitutional challenges to statutory amendments when Oregon and Tennessee opened adoption records. *See Doe v. Sundquist*, 106 F.3d 702, 708 (6th Cir. 1997) (dismissing natural mothers' constitutional challenge to Tennessee's law opening adoption records); *Does v. State*, 993 P.2d 822, 825–26 (Or. Ct. App. 1999) (rejecting natural mothers' state and federal constitutional challenges to Oregon's law opening adoption records); Brett S. Silverman, *The Winds of Change in Adoption Laws: Should Adoptees Have Access to Adoption Records?*, 39 Fam. & Conciliation Cts. Rev. 85, 91–92 (2001) [hereinafter Silverman] (providing personal stories from the Oregon plaintiffs in *Sundquist*, 106 F.3d 702). A woman who placed her child for adoption opposed unsealing adoption records in Oregon because she did "not want to have to tell a curious adoptee that he or she would have been aborted barring the danger [of an abortion], especially after four decades." Silverman, 39 Fam. & Conciliation Cts. Rev. at 91. Moreover, she said she would "be very angry" if the child tried to contact her because "[t]he idea of adoption was to permanently sever the relationship with the child." *Id.* at 92. Another Oregon birth mother placed her daughter for adoption because she was conceived as a result of a "terrifying brutal stranger rape" and said that opening adoption records would be committing "emotional rape." *Id.*

Iowa Code section 600.16A(2)(*d*) protects the biological parents' right to privacy. *See In re Adoption of S.J.D.*, 641 N.W.2d at 803 (rejecting adoptee's constitutional challenge because "[t]he right . . . to information asserted by adoptees directly conflicts with the right to privacy of birth parents to be left alone" (quoting Jason Kuhns, Note, *The*

*Sealed Adoption Records Controversy: Breaking Down the Walls of Secrecy*, 24 Golden Gate U.L. Rev. 259, 269 (1994))).  In *Head v. Colloton*, we weighed the competing interests of a terminally ill plaintiff and an unrelated patient who had undergone tissue typing to determine her suitability as a blood platelet donor for a family member.  331 N.W.2d 870, 872 (Iowa 1983).  The unrelated patient was a potential bone marrow donor for the plaintiff.  *Id.*  The plaintiff petitioned the court for access to the donor's contact information in order to urge her to donate.  *Id.* at 873.  We denied his request and stated,

> An individual's interest in avoiding disclosure of personal matters is constitutionally based.  This right is also recognized at common law.  A valuable part of the right of privacy is the right to avoid publicity concerning private facts.  This right can be as important to a potential donor as to a person in ill health.

*Id.* at 876 (citations omitted).  Other courts have noted a constitutional dimension to the privacy rights of biological parents who give up children for adoption.  *See Mills*, 372 A.2d at 651 ("Th[e] natural parent has a right to privacy, a right to be let alone, that is not only expressly assured by the provisions of N.J.S.A. 26:8–40.1 and N.J.S.A. 9:3–31 but has also [been] recognized as a vital interest by the United States Supreme Court."); *In re Assalone*, 512 A.2d 1383, 1386 (R.I. 1986) ("The natural parents have 'a right to privacy, a right to be let alone,' and the expectation of privacy arising from the confidentiality statute is constitutionally protected." (quoting *Mills*, 372 A.2d at 651)); *Bradey v. Child. Bureau of S.C.*, 274 S.E.2d 418, 421 (S.C. 1981) ("This expectation of confidentiality arising from the statute is constitutionally protected as a right of privacy.").

Finally, the State has an interest in maintaining confidentiality to protect and encourage the adoption process.  *In re Adoption of S.J.D.*, 641

N.W.2d at 799. As the South Carolina Supreme Court aptly observed, "we must recognize that the State's primary concern is in maintaining an effective adoption procedure which serves the best interests of adoptees generally." *Bradey*, 274 S.E.2d at 421. The *Bradey* court cautioned against overreacting to changing attitudes on the confidentiality of adoption records:

> The primary interest of the public is to preserve the integrity of the adoptive process. That is, the continued existence of adoption as a humane solution to the serious social problem of children who are or may become unwanted, abused or neglected. In order to maintain it, the public has an interest in assuring that changes in law, policy or practice will not be made which negatively affect the supply of capable adoptive parents or the willingness of biological parents to make decisions which are best for them and their children. We should not increase the risk of neglect to any child, nor should we force parents to resort to the black market in order to surrender children they can't care for.
>
> The public's interest is relevant as much to the appropriate pace of change as it is to the nature of the change. For example, even if there was general agreement that adoptees should have access to otherwise sealed records, we must still determine whether overly rapid movement in that direction would undermine the goals of adoption itself. In addition, the public interest requires that more research be done to determine the effect of policy change on the attitudes of adoptive parents and biological parents.
>
> No one has yet shown that decades of policy protecting the anonymity of the biological parents and the security from intrusion of the parent-child relationship after adoption have been misguided. Quite the contrary. The overwhelming success of adoption as an institution which has provided millions of children with families, and vice versa, cannot be easily attacked.
>
> The public has a strong interest, too, in preserving the confidential non-public nature of the process. Public attitudes toward illegitimacy and parents who neglect or abuse children have not changed sufficiently to warrant careless disclosure of the circumstances leading to adoption.

*Id.* at 421–22 (quoting *In re Maples*, 563 S.W.2d 760, 763–64 (Mo. 1978) (en banc)). Accordingly, the Rhode Island Supreme Court stated, "We give the benefit of the doubt to the preservation of confidentiality in close cases." *In re Philip S.*, 881 A.2d at 934. Against this backdrop, we conclude the juvenile court correctly denied R.D.'s application to compel disclosure of the identities of her biological parents.

**C. R.D. Failed to Overcome the Statutory Command to Protect the Identities of Her Biological Parents.** Our de novo review of the medical testimony persuades us that disclosure of the identities of R.D.'s parents would assist the treatment of her alcoholism and related depression and anxiety. She is able to maintain sobriety for periods of time and then relapses. Continued alcohol abuse jeopardizes her health and life. Her treating physician, psychotherapist, and psychiatric social worker identify her unsatisfied quest to discover her origins as a root cause of her alcohol abuse. Yet, they can offer no assurances that her problems will resolve upon her discovery of the identities of her biological parents or what will follow.

R.D. cites a decision of a New York court allowing an adult adoptee access to adoption records to identify his biological parents based on testimony of the adoptee's treating psychologist that "gaining such knowledge is a necessary element in the petitioner's mental rehabilitation." *In re Anonymous*, 399 N.Y.S.2d 857, 859 (Sur. Ct. 1977). That adoptee was "estranged from the adoptive parents who loved and reared him," was "unable to distinguish fact from fiction," and was "suffering from 'personality [dysfunction]' which has made the quest for his true identity the single most important thing in his life." *Id.* His biological parents, who had been contacted by a guardian ad litem pursuant to New York law, had consented to the release of their names

and addresses. *Id.* at 858. The court relied on their consent in releasing the information. *Id.* at 859. Such consent is lacking here, and the Iowa adoption statute does not include a provision allowing a guardian ad litem to contact the biological parents to ascertain their position on disclosure. However, nothing prevents parents who give up a child for adoption in Iowa from subsequently filing an affidavit or a written consent to reveal their identities upon the adoptee's request. *See* Iowa Code § 600.16A(2)(*b*)(1), .16A(3).

R.D.'s yearning to identify her birth parents is undoubtedly shared by most adoptees. That yearning alone is insufficient to open sealed adoption records. *In re Adoption of S.J.D.*, 641 N.W.2d at 802; *see also Linda F.M.,* 418 N.E.2d at 1304 ("[M]ere desire to learn the identity of one's natural parents cannot alone constitute good cause."). R.D. has provided the medical evidence lacking in *In re Adoption of S.J.D. See* 641 N.W.2d at 802 (noting adoptee failed to offer any medical evidence). R.D.'s showing triggers the discretionary option for the court to open her records under the first sentence of section 600.16A(2)(*d*), but disclosure of the sealed information remains subject to the statutory mandate in the next sentence to "make every reasonable effort to prevent the identity of the biological parents from being revealed to the adopted person." Iowa Code § 600.16A(2)(*d*). In some cases, the court could allow disclosure of medical information from the adoption records, without revealing the names of the biological parents. *See, e.g.,* Iowa Code § 600.16(1)(*b*), (2) (allowing adopted person over age twenty-one access to medical and developmental histories in adoption records with identifying information redacted); *Doe v. Ward Firm, P.A.,* 579 S.E.2d 303, 307–08 (S.C. 2003) (appointing intermediary to review adoption files and disclose medical information while redacting identities of biological parents). Here, the

adoption records contain no medical information, and all R.D. wants to know is the names of her biological parents. The juvenile court correctly denied that request. To hold otherwise would substantially undermine the statutory confidentiality assured to parents who make the painful decision to give up a child for adoption.

The level of confidentiality varies from state to state, and some commentators favor giving adult adoptees greater access to adoption records. *See generally, e.g.*, Wayne Deloney, *Unsealing Adoption Records: The Right to Privacy Versus the Right of Adult Adoptees to Find Their Birthparents*, 7 Whittier J. Child & Fam. Advoc. 117 (2007) (describing the various types of adoption record statutes and arguing "the state should continue to provide for the best interest of the adoptee by unsealing adoption records" once the adoptee reaches adulthood); Samuels, 53 Rutgers L. Rev. 402–34, 436 (analyzing the history of adoption record confidentiality in the United States, acknowledging the "difficult process of deconstructing lifelong secrecy," but concluding that states will likely reject confidentiality to reflect societal attitude changes); Silverman, 39 Fam. & Conciliation Cts. Rev. at 85 (reviewing adoption laws, the purposes behind them, and proposing a uniform adoption law that provides the adoptive family with full access to medical history of the biological family but allows the biological parent to veto the release of identifying information or future contact).

As the Tennessee Supreme Court observed, "the confidentiality of records is a statutory matter left to the legislature." *Doe v. Sundquist*, 2 S.W.3d 919, 926 (Tenn. 1999) (rejecting a constitutional challenge to the Tennessee statute unsealing adoption records). We reiterate that while "changed attitudes" may warrant a fresh look at the confidentiality of Iowa's adoption records, "it is not our function 'to redraft or interpret

laws differently' from what the legislature intended 'solely to reflect current values or lifestyles.' " *In re Adoption of S.J.D.*, 641 N.W.2d at 802 (quoting *In re Hayden,* 435 N.Y.S.2d 541, 542 (Sup. Ct. 1981)). Rather, "it is best left to the legislature to distinguish the changing mores from shifting moods in society." *Id.* (quoting *In re Hayden,* 435 N.Y.S.2d at 542).

## IV. Conclusion.

For those reasons, we determine the juvenile court correctly denied R.D.'s application to identify her biological parents from the sealed adoption records. We therefore affirm the juvenile court's ruling.

**AFFIRMED.**